## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

BP GROUP, INC.,                                    Civil No. 09-2040 (JRT/JSM)

                          Plaintiff,

v.

CAPITAL WINGS AIRLINES, INC., and
DAVID N. KLOEBER, JR.,

                                                   **MEMORANDUM OPINION**
                          Defendants.                    **AND ORDER**

and

DAVID N. KLOEBER, JR.,

                          Cross-Claimant,

v.

GERALD L. TROOIEN,

                          Cross-Defendant.

---

Aaron Mills Scott and Gary M. Hansen, **OPPENHEIMER WOLFF & DONNELLY LLP**, 45 South Seventh Street, Suite 3300, Minneapolis, MN 55402, for plaintiff.

Michael H. Streater and Christianne A. R. Whiting, **BRIGGS & MORGAN, PA**, 80 South Eighth Street, Suite 2200, Minneapolis, MN 55402, for defendant/cross-claimant David N. Kloeber, Jr.

George G. Eck, **DORSEY & WHITNEY LLP**, 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402, for cross-defendant Gerald L. Trooien.

This case concerns a contract between BP Group, Inc. ("BP Group") and Capital Wings Airlines, Inc. ("CWA") for which defendant David N. Kloeber, Jr. is a guarantor. BP Group and Kloeber have cross-filed motions for summary judgment, and BP Group has also moved to strike the expert report proffered by Kloeber. Because the contract was clearly breached and because Kloeber's affirmative defenses are unsupported by the record and applicable law, the Court will grant summary judgment to BP Group, deny summary judgment to Kloeber, and deny the motion to strike as moot.

## BACKGROUND

BP Group is a Florida corporation named for its Chief Executive Officer, Ben Price. Kloeber and Jerry Trooien are Minnesota businesspeople and occasional business partners who co-owned a Minnesota charter flight company called JetChoice I, LLC ("JetChoice"). (Aff. of Aaron Mills Scott, July 29, 2010, Ex. A, Adams Dep. at 13-14, Docket No. 53.)

In 2008, Kloeber and Trooien acquired CWA, also a charter flight company. Such "on-demand air carriers" are licensed by the Federal Aviation Administration ("FAA") to conduct operations under Part 135 of the Federal Aviation Regulations ("FARS"). (Id., Ex. B at 2.) A "135 certificate" from the FAA allows the carrier to engage in commercial charters. Because a 135 certificate holder cannot own another 135 certificate holder, Kloeber and Trooien created a new parent entity, Corsair Aviation, LLC ("Corsair") which became the sole owner of CWA and JetChoice. (Id.) Kloeber held a majority position in Corsair while Trooien held a minority position.

This dispute arises out of an Aircraft Management Agreement executed in August 2008 by BP Group and CWA. (*Id.*, Ex. B.) Kloeber signed the agreement on behalf of CWA, and Kloeber and Trooien both signed personal guaranty agreements to secure CWA's performance. (*Id.*) The Aircraft Management Agreement concerned a Gulfstream G200 jet aircraft ("the Aircraft") originally leased by Ben Price from First Union Commercial Corporation pursuant to a July 31, 2000 Equipment Lease ("the Headlease"). (*Id.* at 1.) First Union Commercial Corporation was subsequently acquired by Wachovia.[1] Price assigned his rights under the Headlease to BP Group. (Decl. of Michael H. Streater, Aug. 13, 2010, Ex. A, Price Dep. at 7, Docket No. 60.)

The Headlease includes a provision prohibiting BP Group from assigning, subleasing or otherwise transferring its rights or obligations with respect to the Aircraft without Wachovia's permission. (Streater Aff., Ex. B, Dep. Ex. No. 49, ¶ 12.1, Docket No. 63.) BP Group retains the right under the Headlease to sublease to a person or entity in its direct control. (*Id.*)

The Aircraft Management Agreement – drafted with the participation of defendants' counsel – was initially negotiated as an Aircraft Dry Sublease and Management Agreement ("Dry Sublease"). (Scott Aff., Ex. A, Overvig Dep. at 30, Docket No. 53.) BP Group sought Wachovia's consent to enter into the agreement, but Wachovia refused. (Streater Aff., Ex. B, Dep. Ex. No. 52, Docket No. 63.) Price

---

[1] Wachovia was itself later acquired by Wells Fargo. For ease of reference, the Court will refer to the entity from which the Aircraft is leased as Wachovia.

informed Trooien and a JetChoice representative, Brian Overvig,[2] of the development, and asked whether JetChoice or its counsel had "contacts" at Wachovia with whom they could follow up.  (Scott Aff., Ex. P, Docket No. 53.)  Counsel for JetChoice and CWA contacted Wachovia to prevail upon it to change its mind, but his efforts were unsuccessful.  (*Id.*, Exs. Q, R.)  BP Group's counsel then redrafted the agreement as an Aircraft Management Agreement, stating by email, "Ben [Price] is prohibited from subleasing this aircraft to CWA by the terms of his Wachovia lease, but there is no reason why we cannot do this deal pursuant to a management agreement . . . ."  (Streater Aff., Ex. B, Dept. Ex. No. 12, Docket No. 61.)

**The parties agree that at the time the Aircraft Management Agreement was executed, CWA, Kloeber, and BP Group believed that the agreement would comply with FAA requirements and would not violate the Headlease**.  (*Id.*, Ex. A, Price Dep. at 29, Docket No. 60; Decl. of David N. Kloeber, Jr., Aug. 12, 2010, ¶ 4, Docket No. 58.) However, in the course of this lawsuit, Wachovia has asserted that it would not have consented to the Aircraft Management Agreement.  (Streater Aff., Ex. A, Bolton Dep. at 31-32, Docket No. 60.)

Pursuant to the Aircraft Management Agreement, BP Group was to provide the Aircraft to CWA "on a non-exclusive, non-continuous basis and appoint CWA as the sole and exclusive charter operator of the Aircraft" for a term of approximately four years. (Scott Aff., Ex. B at 1, Docket No. 53.)  Among other terms and conditions, CWA was to

---

[2] Brian Overvig had three titles while employed by JetChoice: Director of Operations, General Manager, and later, President. (Scott Aff., Ex. A, Overvig Dep. at 11, Docket No. 53.)

pay BP Group an hourly fee for operating the Aircraft, with a minimum monthly payment of $80,000.  (*Id.* at 6-7.)  Of particular relevance to this dispute are the agreement's assignment clause ("Paragraph 27") and its provision regarding refurbishment. Paragraph 27 provides:

> Neither party shall have the right to assign all or any part of its rights or obligations under this Agreement without the agreement of the other party; provided, however, that **CWA may assign its rights and obligations under this Agreement to another Part 135 on-demand air carrier having common ownership with CWA.**

(*Id.* at 9 (emphasis added).)  The Aircraft Management Agreement lists several items under the heading "FEES PAID BY CWA," including "[p]aint and interior refurbishment."  (*Id.* at ¶ 7 of Ex. A.)  The agreement provides that BP Group will make the Aircraft available without the required monthly minimum payment while the Aircraft is out of service for paint and interior refurbishment.  (*Id.*)

The day after signing the Aircraft Management Agreement, Kloeber sent an internal email to Brian Overvig of JetChoice and a financial consultant to Corsair, stating, "[The Aircraft Management Agreement] is in the name of CWA.  Not sure if you want that or [JetChoice]."  (*Id.*, Ex. C.)  By email on September 4, 2008, Overvig stated that "[i]t will have to go on [JetChoice]."  (*Id.*, Ex. D.)  Corsair's Chief Financial Officer confirmed that "[t]he Ben Price G200 will be on the Jet Choice [135] certificate, entering service in early Jan09."  (*Id.*, Ex. E.)  Kloeber agreed that his company's plan in fall 2009 was to put the JetChoice logo on the Aircraft.  (*Id.*, Ex. A, Kloeber Dep. at 162-63.)

On September 17, 2008, the Aircraft was flown from Sarasota, Florida, where BP Group's hangar is located, to JetChoice's headquarters in St. Paul, Minnesota, and finally

to Grand Junction, Colorado, where West Star Aviation ("West Star") commenced refurbishing and painting the Aircraft. (Aff. of Ben Price, July 29, 2010, at ¶ 4, Docket No. 54.) West Star was instructed to make the Aircraft look identical to JetChoice's two other aircraft. (Scott Aff., Ex. A, Victor Dep. at 23-34, Docket No. 53.)

By December 2008, West Star's refurbishment was completed. (Price Aff. ¶ 8, Docket No. 54.) The bill from West Star totaled $647,887.03. (*Id.* ¶ 7.) Although JetChoice could have completed the necessary paperwork and arranged for an FAA inspection, West Star refused to release the Aircraft until the bill was paid in full. (Scott Aff., Ex. A., Victor Dep. at 47-48, Docket No. 53.)

By that point, however, JetChoice was in dire financial straits and "there were a lot bigger issues than Ben Price." (*Id.*, Adams Dep. at 102.) Kloeber and Trooien were "in the midst of a row about the whole company." (*Id.*) In an email on January 4, 2009, Trooien stated to Kloeber that the West Star payment "is one of the issues which you need to address and provide answers for. **Ben [Price] has a legally binding contract that right now he can jam down our throat including damages**." (*Id.*, Ex. K (emphasis added).) In response to a question regarding this message, Kloeber testified as follows:

> Q:  Did you at this time believe that the contract with BP Group was not enforceable?
>
> A:  No.  I expected Jerry [Trooien] to pay for his refurbishment.

(*Id.*, Ex. A, Kloeber Dep. at 186.)  Kloeber maintains that Trooien should be responsible for the refurbishment completed by West Star.  (*Id.* at 93; Answer of David N. Kloeber, Jr. and Crossclaim Against Gerald L. Trooien, at 7-8, Docket No. 9.)

The Aircraft was grounded and held by West Star for months as the bill went unpaid.  (Price Aff. ¶¶ 6-7, Docket No. 54.)  Finally, on May 1, 2009, BP Group paid the bill in order to retrieve the Aircraft and make use of it.  (*Id.* ¶ 7.)

BP Group filed suit against Kloeber, Trooien, and CWA, alleging breach of contract and breach of the implied covenant of good faith and fair dealing.  Kloeber has asserted counterclaims against Trooien.  BP Group obtained an entry default against CWA on October 22, 2009, and dismissed its claims against Trooien without prejudice on January 7, 2010.  (Docket Nos. 19, 20.)  On October 25, 2010, Trooien filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code, staying any claims against him under 11 U.S.C. § 362.  (Docket No. 81.)

BP Group has moved for summary judgment against Kloeber.  Kloeber has moved for summary judgment against BP Group, arguing that CWA is not liable to BP Group because the Aircraft Management Agreement is illegal and unenforceable and should be deemed void.  Kloeber also argues that BP Group materially breached the agreement and failed to perform conditions precedent.  In addition, BP Group has moved to strike the report and opinions of expert witness John Craig Weller.

**ANALYSIS**

## I.      THE PARTIES' SUMMARY JUDGMENT MOTIONS

### A.      Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In diversity cases, the Court must apply the choice of law principles of the forum state.  *Surgidev Corp. v. Eye Tech., Inc.*, 648 F. Supp. 661, 679 (D. Minn. 1986). "[W]here the parties by express contractual provisions have designated that the laws of a particular state shall govern disputes arising under the agreement, Minnesota courts have applied the substantive law of the designated state . . . ."  *Id.*  The Aircraft Management Agreement contains a choice of law provision designating Florida as the applicable law governing disputes, and the parties agree that Florida law applies to this conflict.

**B.      Breach of Contract**

Under Florida law, "[t]he elements of an action for breach of contract are: (1) the existence of a contract, (2) a breach of the contract, and (3) damages arising from the breach." *Knowles v. C.I.T. Corp.*, 346 So. 2d 1042, 1043 (Fla. Dist. Ct. App. 1977). "A contract of guaranty is the promise to answer for the payment of the debt, default or performance of another." *Amerishop Mayfair, L.P. v. Billante*, 833 So. 2d 806, 809 (Fla. Dist. Ct. App. 2002).

The basis for BP Group's summary judgment motion is simple: CWA and/or JetChoice, its alleged assignee under Paragraph 27, breached the Aircraft Management Agreement by failing to make a single one of the numerous monthly payments due and refusing to pay West Star for refurbishment and paint work conducted at its behest. As a guarantor for CWA and its successors in interest under the Aircraft Management Agreement, Kloeber is liable for the damages BP Group incurred from the breach. Accordingly, BP Group argues that it is entitled to summary judgment against Kloeber.

Kloeber does not dispute the fact of his guaranty, or the failure of either CWA or JetChoice[3] to pay the West Star bill or make any monthly payment under the Aircraft Management Agreement. These uncontested facts warrant a grant of summary judgment to BP Group, but only if the Aircraft Management Agreement is valid and enforceable. Kloeber defends against BP Group's summary judgment motion, and moves for summary

---

[3] As discussed below, there is a question of factual dispute regarding whether CWA made a proper assignment to JetChoice under Paragraph 27, but that dispute is immaterial to the Court's disposition of the instant motion against **Kloeber**, who guaranteed the performance of CWA **and its successors** under the Aircraft Management Agreement.

judgment himself, by arguing several affirmative defenses. Specifically, Kloeber asserts that (1) the Aircraft Management Agreement is illegal on public policy grounds, (2) the Aircraft Management Agreement is unenforceable based on the parties' mutual mistake, and (3) BP Group failed to perform certain conditions precedent, excusing any failure of CWA to perform under the agreement. Kloeber also argues that he is not responsible for the West Star bill because West Star's work was not conducted at the behest of CWA. The Court will consider each argument in turn.

### 1.    Public Policy

First, Kloeber argues that the Aircraft Management Agreement is illegal as it calls for a violation of federal regulations and is contrary to public policy. Under Florida law, "[o]ne well-established defense to the enforcement of a contract is that the contract violates public policy." *Jaylene, Inc. v. Steuer ex rel. Paradise*, 22 So. 3d 711, 714 (Fla. Dist. Ct. App. 2009) (Northcutt, J., concurring). However, courts "should be guided by the rule of extreme caution when called upon to declare transactions void as contrary to public policy . . . ." *Gulf Ins. Co. v. Dolan, Fertig and Curtis*, 433 So. 2d 512, 515 (Fla. 1983). A contract "should not be struck down on public policy grounds unless it is clearly injurious to the public good or contravene[s] some established interest of society." *Fla. Windstorm Underwriting v. Gajwani*, 934 So. 2d 501, 506 (Fla. Dist. Ct. App. 2005) (quotation marks omitted).

According to Kloeber, the Aircraft Management Agreement violates regulatory guidance appearing in an appendix to an FAA notice cancelled by its own terms in 2007.

(Streater Decl., Ex. C at 9, Docket No. 64 (quoting App. 3, FAA Notice 8000.347).)  The appendix provides that a 135 certificate holder should not "[e]ngage in any arrangement . . . which allows the use of an aircraft for operations . . . without a complete, effective and sustainable transfer of operational control to the certificate holder for all Part 135 operations conducted under these operations specifications."  *Id.*  Kloeber asserts that because the Headlease prohibited BP Group from assigning or transferring its rights in the Aircraft without Wachovia's permission, which was never obtained, it was impossible for BP Group to transfer operational control of the Aircraft to CWA through a sustainable legal transfer.  (*Id.*, Ex. B, Dep. Ex. No. 49, ¶ 12.1, Docket No. 63.)

However, "[t]he possibility of performing a contract in an illegal manner will not render it unenforceable as contrary to public policy **where the illegality does not appear on the face of the instrument**."  Paul M. Coltoff, Sonja Larsen, et al., 17A Corpus Juris Secundum, Contracts § 218 (emphasis added); *see also De Lage Landen Fin. Servs., Inc. v. Cricket's Termite Control Inc.*, 942 So. 2d 1001, 1004 (Fla. Dist. Ct. App. 2006) ("[W]here a contract could have been performed in a legal manner as well as in an illegal manner, it will not be declared void because it was in fact performed in an illegal manner . . . [n]or will a contract be declared void because it might have been performed in an illegal manner . . . .") (quotation marks omitted); *Neiman v. Galloway*, 704 So. 2d 1131, 1132 (Fla. Dist. Ct. App. 1998) ("[T]he law should not presume that the parties intended to form an illegal contract, and the court should focus on **whether the contract could have been performed without anyone acting contrary to the public welfare**." (emphasis added)).

The Aircraft Management Agreement is not illegal on its face; it does not require the parties to proceed without Wachovia's consent. To the contrary, the agreement specifically states that "CWA will not operate the Aircraft in any manner prohibited by any regulatory or government agency . . . or by the [Headlease]." (Scott Aff., Ex. B at 2, ¶ 4, Docket No. 53.) Had Wachovia given its consent to the Aircraft Management Agreement (assuming it was necessary), the very same agreement would stand without a single word altered. The defect identified by Kloeber – BP Group's failure to obtain Wachovia's permission – is external to the document itself.

Kloeber asserts that the regulatory guidance prohibiting the "engage[ment] in any arrangement" absent a sustainable transfer of control rendered the Aircraft Management Agreement contrary to public policy the moment it was signed, but it is far from clear that the FAA would have viewed the lack of consent from Wachovia as an impediment to public safety had CWA or its successor chosen to proceed with the FAA inspection process (which it did not). Kloeber's proffered expert, John Craig Weller, opines that it would have. However, after signing the Headlease in 2000, BP Group entered into Aircraft Management Agreements with three different on-demand air carriers prior to contracting with CWA, apparently without incident. (Scott Aff., Ex. A, Price Dep. at 8-10, Docket No. 53.) Exercising extreme caution as Florida law mandates, in these circumstances the Court cannot conclude that public policy concerns render the contract unenforceable, even taking into account Weller's report.

### 2.    Mutual Mistake

Kloeber also argues that the Aircraft Management Agreement is unenforceable and should be rescinded based on the parties' mutual mistake.  Under Florida law, "[w]here a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party."  *Leo v. MacLeod*, 752 So. 2d 627, 629 (Fla. Dist. Ct. App. 1999) (quotation omitted).  According to Kloeber, the parties entered into the Aircraft Management Agreement under the mutually mistaken impression that BP Group could transfer operational control to CWA through the agreement without Wachovia's permission.

However, a mutual mistake will not require a voidance of a contract where "the adversely affected party bears the risk of the mistake."  *Rawson v. UMLIC VP, L.L.C.*, 933 So. 2d 1206, 1210 (Fla. Dist. Ct. App. 2006).  A party bears the risk of a mistake when "he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient . . . ."  *Id.* (quotation omitted); *see also Rosique v. Windley Cove, Ltd.*, 542 So. 2d 1014, 1016 (Fla. Dist. Ct. App. 1989) (a party who elects to "take a chance" and enters into a contract despite knowing of a possible mistake waives his right to rescind the contract).  In addition, the risk of a mutual mistake may be allocated to an adversely affected party by the Court "on the ground that it is reasonable in the circumstances to do so."  *Rawson*, 933 So. 2d at 1210.

Undisputed record evidence shows that CWA and its agents were fully aware that Wachovia may not approve the Aircraft Management Agreement, but nonetheless agreed to sign it.     BP Group provided a copy of the Headlease to Trooien as early as December 14, 2007, and the Aircraft Management Agreement explicitly references the Headlease.  (Scott Aff., Exs. B, M, Docket No. 53.)  Counsel for JetChoice and CWA attempted to prevail upon Wachovia to approve the Dry Sublease, as the transaction was initially structured.  (*Id.*, Exs. P, Q, R.)  When Wachovia declined, Trooien, Kloeber's co-guarantor and  minority owner of Corsair, sent an email to Kloeber stating, "Wachovia is not cooperating and we will need to do a management agreement which is what we originally wanted."  (*Id.*, Ex. S (emphasis added).)

As Trooien explained:

> **CWA knew all about this issue at the time the [Aircraft Management Agreement] was signed.**  In fact, the deal with BP Group was originally designed to be a direct sublease of the Aircraft from BP Group to JetChoice, but we discovered that Wachovia did not want the deal to be structured that way.  **The concept of drafting the [Aircraft Management Agreement], and not a sublease, came from us – the JetChoice/CWA side – and it was done specifically for the purpose of allowing the Aircraft to be put into service with CWA.**  We had every expectation that the Aircraft would operate on CWA's operations specification under the [Aircraft Management Agreement] without problems.

(*Id.*, Ex. T at ¶ 11 (emphasis added).)

Citing the email from BP Group's counsel that "there is no reason why we cannot do this deal pursuant to a management agreement[,]" Kloeber argues that BP Group, not CWA, suggested reframing the agreement as an Aircraft Management Agreement. (Streater Aff., Ex. B, Dept. Ex. No. 12, Docket No. 61.)   Which party initiated and

promoted the idea of redrafting the Dry Sublease as an Aircraft Management Agreement is immaterial; the question is whether Kloeber (through CWA) waived his right to rescind the agreement by entering into it despite knowing of a possible mistake.

An abundance of undisputed record evidence shows that he did.  Beyond the evidence that Kloeber was well aware of the Headlease and of Wachovia's refusal to agree to the Dry Sublease, Brian Overvig testified that he repeatedly expressed concern to Kloeber and Trooien that the FAA would consider the Aircraft Management Agreement a lease and that Wachovia would not approve of it.  (Scott Aff., Ex. A, Overvig Dep. at 61-62, Docket No. 53.)   Kloeber nonetheless decided to sign the Aircraft Management Agreement and guaranty without insisting on Wachovia's consent.  The Court therefore concludes that Kloeber waived the right to rescind the contract based on the parties' mutual mistake.  *See Harbor Ins. Co. v. Stokes*, 45 F.3d 499, 501 (D.C. Cir. 1995) ("In order for a mistake to have legal significance and to constitute a basis for invalidating a compromise, it must be based upon the parties' unconscious ignorance; it must not relate to one of the uncertainties of which the parties were conscious and which it was the purpose of the compromise to resolve and put at rest.") (quotation marks omitted).

### 3.    Conditions Precedent

Kloeber's third defense is that even if the Court concludes that the Aircraft Management Agreement is enforceable, BP Group failed to perform certain conditions precedent, excusing any failure of CWA to perform under the agreement.  *See Alvarez v. Rendon*, 953 So. 2d 702, 708 (Fla. Dist. Ct. App. 2007) ("[T]here must be at least a

substantial performance of conditions precedent in order to authorize a recovery as for performance of a contract." (quotation marks omitted)).

The condition precedent identified by Kloeber is BP Group's obligation to obtain Wachovia's consent before transferring operational control of the Aircraft to CWA. That condition, however, does not appear in the Aircraft Management Agreement. "[C]onditions precedent are not favored, and courts will not construe provisions to be such, unless required to do so by plain, unambiguous language or by necessary implication." *In re Estate of Boyar*, 592 So. 2d 341, 343 (Fla. Dist. Ct. App. 1992) (citing 17A Am. Jur. 2d Contracts § 471 (1991)). The contractual provision Kloeber cites as imposing a condition precedent upon BP Group is a generic, ambiguous requirement **placed on both parties**:

> CWA and [BP Group] shall, from time to time, perform such other and further acts and execute and deliver any and all such other and further instruments or documents as may be required by law or reasonably requested by the other party to establish, maintain and protect the respective rights and remedies of the other and to carry out the intent and purpose of the [Aircraft Management] Agreement.

(Scott Aff., Ex. B at 9-10, Docket No. 53.) This language is far from a plain, unambiguous provision clearly requiring BP Group to obtain Wachovia's permission before CWA was obligated to perform at all under the Aircraft Management Agreement. Indeed, the agreement specifically places upon **CWA** responsibility for "not operat[ing] the Aircraft in any manner prohibited by any regulatory or government agency . . . or by the [Headlease]." (*Id.* at 2, ¶ 4.)

Moreover, conditions precedent are "those acts or events[] which occur **subsequently to the making of a contract**, that must occur before there is a right to immediate performance . . . ." *Boyar*, 592 So. 2d at 343 (emphasis added). It is Kloeber's contention, however, that Wachovia's consent was required before the Aircraft Management Agreement could be executed. In essence, Kloeber is arguing that BP Group's failure to take an action – a failure about which Kloeber knew and an action the parties believed was unnecessary – excuses CWA and its successors from all obligations under the Aircraft Management Agreement. Kloeber waived this defense for the same reasons he waived his right to rescission based on mutual mistake. *See Wilson & Toomer Fertilizer Co. v. Auto. Ins. Co.*, 283 F. 501, 510 (S.D. Fla. 1922) ("Upon reason and principle, when a condition is waived, it is no longer a condition precedent . . . .").

### 4.     West Star Bill

Finally, Kloeber argues that, assuming the Aircraft Management Agreement is enforceable, he is not liable for the paint and refurbishment work performed by West Star because it was not directed by CWA, but rather by JetChoice, which was not a signatory to the Aircraft Management Agreement and to which CWA never formally assigned its interests under the agreement. This argument ignores the plain language of the provision of the Aircraft Management Agreement titled "**FEES PAID BY CWA**": "Paint and interior refurbishment. **[BP Group] will make Aircraft available without required monthly minimum while Aircraft is out of service for paint and interior refurbishment**." (Scott Aff., Ex. B ¶ 7 of Ex. A, Docket No. 53 (emphasis added).)

Beyond the arguments regarding Wachovia's consent, Kloeber does not allege that BP Group failed to make the Aircraft available;[4] nor does he deny that the Aircraft was out of service for several months while West Star engaged in paint and refurbishment work.  The Aircraft Management Agreement clearly contemplates that CWA will assume the fees associated with such work in those circumstances, **regardless of which particular individual or entity specifically directed the work and regardless of what logo was painted onto the Aircraft**.  The only action that might feasibly relieve CWA of its responsibility, and in turn relieve Kloeber as a guarantor, would be an assignment of CWA's rights and obligations pursuant to Paragraph 27 of the Aircraft Management Agreement.

The parties' dispute regarding whether CWA properly assigned its rights to JetChoice under Paragraph 27, however, is immaterial to the question of whether Kloeber is responsible for West Star's bill (and for BP Group's other damages arising out of the contractual breach).  CWA was responsible for the bill under the Aircraft Management Agreement's explicit language assuming no assignment occurred.  If CWA did assign its rights and obligations to JetChoice under Paragraph 27, then JetChoice was responsible.

---

[4] Kloeber does contend that "CWA never obtained possession of the subject aircraft." (Def.'s Mem. in Opp. at 25, Docket No. 66.)  To the extent that this contention is based on the premise that BP Group physically withheld the Aircraft, it is devoid of evidentiary support; to the extent it is based on an insinuation that JetChoice took possession of the Aircraft without a formal assignment under Paragraph 27, it is irrelevant, as discussed below.

Either way, **Kloeber's guaranty covered both CWA and its successors and assigns**.[5] (*Id.* at Ex. D.)

Kloeber insinuates that BP Group was somehow involved in the refurbishment work because Dennis Blackburn, a plane broker who once represented BP Group's owner Ben Price, participated in the refurbishment.   As Blackburn and Kloeber made clear at their depositions, Kloeber and Trooien asked Blackburn to be involved in the refurbishment of the Aircraft to benefit from discounts available to Blackburn because of the volume of work he delivered through other clients.   (Aff. of Aaron Mills Scott, Sept. 7, 2010, Ex. Y, Blackburn Dep. at 68-70, Kloeber Dep. at 149-50, Docket No. 71.)

Not only is Kloeber's position that he is not responsible for the West Star bill contradicted by the Aircraft Management Agreement itself, it is also undermined by his own deposition testimony.   Kloeber did not testify that BP Group, which actually paid the West Star bill, is legally responsible for it; rather, it is his position that Trooien should

---

[5] Although the Court need not determine whether an assignment was made to resolve the instant motion, it is worth noting the fluidity of the relationship between JetChoice, CWA, and Corsair.   The Aircraft Management Agreement references and was signed by CWA, but both Trooien and Overvig characterized the parties' negotiation as between JetChoice and BP Group. (Scott Aff., Ex. A, Overvig Dep. at 30, Ex. T at ¶ 11, Docket No. 53.)   The attorney who reached out to Wachovia introduced himself as representing both JetChoice and its "commonly owned affiliate, Capitol Wings Airlines" as of May 21, 2008.   (*Id.*, Ex. O (emphasis added).)   The day after signing the Aircraft Management Agreement, Kloeber stated, "[The Aircraft Management Agreement] is in the name of CWA.   Not sure if you want that or [JetChoice]."   (*Id.*, Ex. C.)   On November 11, 2008, a JetChoice representative instructed West Star, "Do not put the C/W on the G-200 yet, ours may need to go on the aircraft."   (*Id.*, Ex. F.)   Paragraph 27 did not require any written documentation to finalize the assignment of CWA's rights to another commonly owned 135 certificate holder.   This evidence suggests that Kloeber and his associates utilized the fluidity between CWA and JetChoice, as enabled by Paragraph 27, yet he is now attempting to escape liability for a bill incurred by one of his entities by arguing that it is the responsibility of the other.

pay for the refurbishment.  (Scott Aff., Ex. A, Kloeber Dep. at 93, 186, Docket No. 53.)

Kloeber and Trooien, however, signed separate and independent guaranties.  (*Id.*, Ex. B

at Exs. C, D.)

### 5.    Conclusion

The Court concludes that BP Group has established an absence of material factual

dispute with regard to Kloeber's affirmative defenses, and that the Aircraft Management

Agreement is valid and enforceable as a matter of law.  Since record evidence

conclusively establishes that either CWA or its assignee breached the Aircraft

Management Agreement by failing to pay the West Star bill and failing to make a single

monthly payment, and since Kloeber's guaranty applies to CWA and its assignees, BP

Group is entitled to summary judgment against Kloeber.[6]

---

[6] BP Group's complaint states three counts: (1) breach of contract against CWA;
(2) breach of the implied covenant of good faith and fair dealing against CWA, and (3) breach of
contract against Kloeber and Trooien.  BP Group has received a default against CWA, dismissed
its claims against Trooien without prejudice, and moves for summary judgment only against
Kloeber.  Therefore only the single count against Kloeber is at issue.  Nonetheless, in its moving
paper, BP Group argues that CWA breached the implied covenant of good faith and fair dealing
when it arranged for paint and interior refurbishment at West Star and then failed to pay the bill.
"Florida contract law recognizes the implied covenant of good faith and fair dealing in every
contract."  *Ins. Concepts and Design, Inc. v. Healthplan Servs., Inc.*, 785 So. 2d 1232, 1234 (Fla.
Dist. Ct. App. 2001).

As discussed above, however, the parties dispute whether the West Star work was
performed at the behest of CWA or JetChoice, and there is evidence to support both contentions.
The Court therefore cannot conclude that **CWA** breached the implied covenant of good faith and
fair dealing, but this determination does not preclude a grant of summary judgment to BP Group
on its claim against **Kloeber** based on his failure to fulfill his obligations as a guarantor for
CWA and its successors and assignees.

C.      **Damages**

Kloeber objects to the amount of damages asserted by BP Group. Specifically, Kloeber challenges BP Group's requests for:

1.      the entire West Star bill, in the amount of $647,887.03;

2.      monthly payments under the Aircraft Management Agreement, less charter revenue earned from alternate sources and BP Group's use of the Aircraft, in the amount of $860,632.01; and

3.      "additional damages and deferred maintenance" in the amount of $1,333,313.48.

(Scott Aff., Ex. X, Docket No. 53; Price Aff., ¶¶ 7-10, Docket No. 54.)

Kloeber objects to the West Star bill on the ground that because the Aircraft was initially in poor condition, much of the refurbishment work would have been necessary even without an agreement between CWA and BP Group. Regardless of its necessity, the work was clearly CWA or its assignee's responsibility under the Aircraft Management Agreement as "FEES PAID BY CWA." (Scott Aff., Ex. B at ¶ 7 of Ex. A, Docket No. 53.)

Under the terms of the agreement, BP Group is responsible for "[a]ll maintenance unless caused by negligence[,] gross negligence[,] or willful misconduct of CWA crew or passengers[.]" (*Id.* at ¶ 8 of Ex. A.) Kloeber argues that several actions taken by West Star – including the installation of LED lighting and an IPOD docking station – are more maintenance type work than refurbishment. (Aff. of Brian Overvig, Sept. 7, 2010, at ¶ 11, Docket No. 68.) These improvements, however, are generally cosmetic, and they were undertaken at the direction of Kloeber's entity – whether JetChoice or CWA – in

the context of painting and refurbishing the Aircraft.  To the extent that some of the work might have been characterized as maintenance, the Aircraft Management Agreement provides that "[a]ll maintenance expenditures in excess of $1,000 shall be subject to [BP Group]'s prior approval . . . ."  (Scott Aff., Ex. B at 5, ¶ 10(G), Docket No. 53.)  Kloeber has proffered no evidence that BP Group approved of any part of West Star's work potentially characterized as maintenance.   The Court concludes that Kloeber is responsible for the entire West Star bill.

As for the monthly payments, the Aircraft Management Agreement requires CWA to make a minimum monthly payment of $80,000 to BP Group.  (*Id.* at 6-7.)  It is undisputed that neither CWA, nor JetChoice as its successor, nor Trooien or Kloeber as guarantors, made a single payment under this provision.  It is also undisputed that the Aircraft was unavailable during the period when West Star performed its paint and refurbishment work and for many months after the work was completed when West Star refused to release the Aircraft.  (*Id.*, Ex. A., Victor Dep. at 47-48, Docket No. 53.)  After paying the West Star bill and recovering the Aircraft in May 2009, BP Group entered into another Aircraft Management Agreement with Priester Aviation, LLC ("Priester") on June 14, 2009.

Under Florida law, if the disposition of a breached lease

is by lease agreement **substantially similar to the original lease** agreement and the new lease agreement is **made in good faith and in a commercially reasonable manner**, the lessor may recover from the lessee as damages:

(a) Accrued and unpaid rent as of the date of the commencement of the term of the new lease agreement; [and]

> (b) The present value, as of the same date, of the commencement of the term of the new lease agreement of the total rent for the then remaining lease term of the original lease agreement minus the present value, as of the same date, of the rent under the new lease agreement applicable to that period of the new lease term which is comparable to the then remaining term of the original lease agreement . . . .

Fla. Stat. § 680.527(2)(a)-(b) (emphasis added).  Under this provision, BP Group would be entitled to the unpaid monthly rental payments owed by CWA or its successor, minus the payments it received from Priester under the new agreement.  However, "[i]f the lessor's disposition is by lease contract that for any reason does not qualify for treatment under subsection (2)," – i.e. if the new lease is **not** substantially similar to the breached lease – the lessor may only recover from the lessee under another provision, Fla. Stat. § 680.528.  *Id.* § 680.527(3).  Section 680.528 generally limits the lessor's recovery to the amount of accrued and unpaid rent as of the date the lessor repossesses the goods. Fla. Stat. § 680.528(1)(a).

Kloeber argues that the new agreement with Priester is not substantially similar to the Aircraft Management Agreement with CWA because the new agreement mandates no monthly minimum payments, and that BP Group's damages for monthly payments are therefore restricted by Fla. Stat. § 680.528. Kloeber has not challenged BP Group's assertion that Price sought unsuccessfully to obtain a monthly minimum but that given the changed economic climate he was unable to do so.  The phrase "substantially similar" is purposely unspecified; "[g]iven the many variables facing a party who intends to lease goods and the rapidity of change in the market place, . . . [t]he decision of whether the new lease agreement is substantially similar to the original [must] be determined case by

case." Fla. Stat. § 680.527, cmt. 4. The only dissimilarity identified by Kloeber is the monthly minimum provision. Given BP Group's unrebutted argument that economic conditions rendered such a provision unfeasible, the Court concludes that BP Group is entitled to recovery under Fla. Stat. § 680.527, not Fla. Stat. § 680.528.

The Court cannot, however, accept in its entirety BP Group's claim of over one million dollars in "additional damages and deferred maintenance." Most of the items supporting this claim – training costs, pilot services, mechanic's salary, hangar rental, maintenance costs, and BP Group's payments to Wachovia under the Headlease – are **BP Group's responsibility** under the Aircraft Management Agreement and Headlease. (Scott Aff., Ex. B, at ¶¶ 6, 7, 10(D)-(E), Docket No. 53.) BP Group argues that under the agreement it expected to obtain revenue from CWA and also enjoy the benefits of having a private jet. Because of the breach, the Aircraft was unavailable until May 2009 but BP Group was still required to pay expenses associated with the Aircraft. The parties, however, did not envision constant, uninterrupted use by BP Group of the Aircraft. Moreover, had CWA/JetChoice not breached the Aircraft Management Agreement, BP Group would not have had access to the Aircraft while it was undergoing refurbishment; it still would have been responsible during that period for training costs, pilot services, mechanic's salary, hangar rental, maintenance costs, and Headlease payments. In these circumstances, the Court concludes that BP Group is responsible for these items as the plain language of the Aircraft Management Agreement dictates.

Kloeber also challenges the costs of returning the Aircraft to Florida, where the Aircraft was supposed to be based, after BP Group paid the West Star bill. The Court

concludes that BP Group is entitled to recover this cost, $9,702.63, as part of BP Group's "additional damages," because BP Group is not responsible for "charges associated with any flight conducted for, by, or on behalf of CWA other than those specifically set forth" in the Aircraft Management Agreement. (*Id.* at 6, ¶ 14(A).)

The Aircraft Management Agreement provides that any payments unpaid under the agreement shall bear interest at a rate of 12% per annum, and that in the event of a dispute, the prevailing party is entitled to reasonable attorney fees and costs. (*Id.* at 8-9, ¶¶ 22, 34.) These provisions apply to this lawsuit.

## II.      BP GROUP'S MOTION TO STRIKE

BP Group has moved to strike the report and opinions of expert witness John Craig Weller, who opines about the necessity of obtaining Wachovia's consent. Since BP Group is entitled to summary judgment even taking into account Weller's report, the Court denies this motion as moot.

## ORDER

Based on the foregoing, and the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Defendant David N. Kloeber, Jr.'s Motion for Summary Judgment [Docket No. 42] is **DENIED**.

2.      Plaintiff BP Group's Motion for Summary Judgment as to claims against David Kloeber [Docket No. 50] is **GRANTED**.

3.      Plaintiff BP Group's Motion to Strike Report and Opinions of Expert Witness John Craig Weller [Docket No. 45] is **DENIED as moot**.

4.      Judgment shall be entered in favor of plaintiff BP Group, Inc. and against defendant David N. Kloeber, Jr., in the amount of $1,518,221.67.   This amount encompasses BP Group's payment to West Star Aviation ($647,887.03), monthly payments due under the Aircraft Management Agreement less charter revenue earned from alternate sources and BP Group's use of the Aircraft ($860,632.01), and the costs of returning the Aircraft to Florida ($9,702.63).

5.      Kloeber shall also pay interest on the amounts listed in paragraph 4 at the rate of 12% per annum commencing the day after each amount was due.

6.      Within thirty (30) days of this Order, plaintiff shall submit a brief and affidavit(s) setting forth the attorney's fees and costs it expended prosecuting this lawsuit. Defendant Kloeber may respond within thirty (30) days after receipt of the plaintiff's submission.

The Clerk of Court is **DIRECTED** to enter judgment in favor of plaintiff BP Group, Inc. against defendant David N. Kloeber, Jr., in the amount of $1,518,221.67.


DATED:  March 14, 2011                      s/ John R. Tunheim
at Minneapolis, Minnesota.                         JOHN R. TUNHEIM
                                            United States District Judge